**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **JOHN URANGA, III** | § | |
| **Petitioner** | § | |
| | § | |
| **V** | § | **CIVIL ACTION NO: 7:11-CV-088–O-KA** |
| | § | |
| **DIRECTOR TDCJ-CID** | § | |
| **Respondent** | § | |

**Report and Recommendation**

Petitioner Uranga seeks habeas corpus relief in this Court pursuant to 28 U.S.C. §2254. Under the authority of 28 U.S.C. § 636(b) and Rules 8(b) and 10 of the Rules Governing Section 2254 Proceedings for the United States District Courts, on December 10, 2013, this case was referred to the undersigned United States Magistrate Judge by Order of Reference (Docket No.34) for hearing, if necessary, and proposed findings of fact and recommendation for disposition. I recommend that the District Court deny Petitioner's Application for Writ of Habeas Corpus for the following reasons:

Custody Status

The Petitioner, John Uranga III,  is currently in custody of the Texas Department of Corrections serving a sentence of life imprisonment[1] pursuant to a 2008 judgment and sentence out of the 78th District Court of Wichita County, Texas.  Uranga was charged with possession of a

---

[1]     The state court records submitted herein by the state of Texas on September 6, 2011, contain the following materials which shall herein be referenced as follows: "CR" refers to the state court clerk's record of the trial papers; "RR" refers to the state court reporter's transcript of trial court proceedings; "DAR" refers to the record on the direct appeal; and "SHCR" refers to the state court clerk's record of the state habeas corpus proceeding records.

controlled substance, namely methamphetamine in amount of one gram or more but less than four grams, enhanced to life imprisonment with two prior felony convictions. Uranga entered a plea of not guilty to a jury. On November 29, 2006, the jury found Uranga guilty as charged and, on November 30, 2006 assessed punishment at life imprisonment.

<u>Punishment Events</u>

The same twelve person jury that served at the guilt/innocence stage also served and heard the evidence at the punishment stage.  During the punishment stage, for sentence enhancement purposes, the State introduced evidence of Uranga's two prior felony convictions and a host of unadjudicated offenses, including one involving a car chase incident. This incident took place in September of 2006 when Uranga drove his car onto someone's property to elude the police during the car chase.  This incident was captured in by a video camera in the police vehicle that was chasing Uranga.  When the State offered the video recording into evidence and played it for the jury, one of the jurors discovered that it was his lawn that had been damaged by the Uranga's careening car. Outside the presence of the other jury members, the court questioned the juror regarding the incident with regard to any potential bias that may have affected the juror as a result of the incident. Following the colloque between the trial judge and the juror, Uranga's trial counsel verbally moved for a mistrial but the trial judge overruled the mistrial motion. It was this ruling that formed the foundation of Uranga's direct appeal, the discretionary review, his state habeas corpus proceeding, and this cause now before this court.

<u>Post-Trial Procedural Status</u>

On direct appeal Uranga's conviction was affirmed by the Sixth Court of Appeals of Texas in early 2008 with written opinion. *Uranga v. State* , 247 S.W.3d 375 (Tex. App.–Texarkana 2008,

pet. granted). Thereafter, the Texas Court of Criminal Appeals granted Uranga's petition for discretionary review. *Uranga v. State*, PSR No. 0385-08 (Tex. CIM. App. August 20, 2008). On November 17, 2010, the Court of Criminal Appeals affirmed the judgments of the appellate and trial courts with written opinion. *Uranga v. State* , 330 S.W.3d 301 (Tex. CIM. App. 2010). On April 25, 2011, Uranga filed an application for state writ of habeas corpus challenging this conviction. SHCR-01 at p. 2. On June 22, 2011, the Court of Criminal Appeals denied relief with written order. SHCR- 01at pp. 1-2.  Then on July 8, 2011, Uranga filed his federal habeas corpus petition herein (Docket No. 1).

<u>Factual Background of Offense</u>

The Sixth Court of Appeals accurately summarized the factual background for the initial prosecution in its opinion[2] as follows:

> "Kimberly Pinner was working for the Sears department store in Wichita Falls August 19, 2005, when she detained two men (one of whom was Uranga) for suspected shoplifting. When Pinner searched through Uranga's Dillard's shopping bag (in which Pinner found several items believed to have been stolen from Sears), she found a satchel. Pinner then unzipped this satchel and saw what appeared to be drugs inside. Pinner closed the satchel, put it down in a location away from Uranga's reach, and continued questioning the suspects regarding the thefts. Meanwhile, Uranga kept repeatedly reaching toward his ankle in an attempt to retrieve something hidden inside his sock. These furtive movements made Pinner suspicious, and she repeatedly asked Uranga to remain still until police arrived. But Uranga did not heed Pinner's request; instead, he eventually regained possession of the satchel, which he opened to retrieve the drugs, and attempted to swallow those drugs. Sears employees were ultimately able to pull the drugs out of Uranga's mouth and regain control of the situation until police arrived."

<u>Petitioner's Alleged Claims for Relief</u>

By his petition Uranga makes four claims:

---

[2]        *Uranga v. State*, *supra*. at p. 380.

1. *Implied Bias* -That he was deprived of a fair trial by jury since one juror learned during the sentencing proceedings that his lawn had been run over by Uranga during a car chase event making that juror "impliedly biased;"

2. *Failure to Investigate*-That he received ineffective assistance of trial counsel due to counsel's failure during pretrial to investigate to learn of, locate and view the video tape of the car chase- thereby causing him not to directly *voir dire* the juror which would have disclosed the juror's "actual bias" and would have lead to him being stricken from the jury panel for cause.

3. *Brady Violation* -That the prosecutor committed a *Brady* violation by failing to produce a video tape from the store which purportedly would show Uranga's lack of possession of the drugs; and,

4. *Actual Innocence* -That Uranga was "actually innocent."

<u>State's Responses to the Claims</u>

The State acknowledges that with respect to Uranga's claims (as paraphrased above) Uranga has exhausted his state remedies and that pursuit of such claims in this Court are not barred by limitations. The State's answers Uranga's claims follow.

As to the *Implied Bias* claim, the state asserts: (1) That the Court of Criminal Appeals (CCA) made express and implied fact and credibility findings which are entitled to deference. The CCA found Uranga had not proved juror's actual bias; (2) That the trial court properly conducted a hearing as to any actual bias of the juror and impliedly found that the juror was not biased; and, (3) That the doctrine of Implied Bias, if it has application at all in the State of Texas, applies only to "exceptional" or "extreme" cases, of which this case is not one.

As to the *Failure to Investigate* claim, the state asserts: (1) That Uranga made no showing

that had his counsel investigated and found the tape he could have tied the event (Uranga's car running over the juror's lawn) to the individual juror whose bias is alleged so as to have effectively excluded such juror from the jury; (2) That this conclusory allegation was decided adversely to Uranga by the Court of Appeals (CA) and such finding is entitled to due deference; and, (3) That, besides, even if the juror had been barred from the punishment stage proceedings, Uranga cannot show any prejudice since he cannot show that the sentence would have been any different.

As to the *Brady* claim, the state asserts: (1) That there was no evidence withheld; (2) That there were no surveillence tapes of the Sears store where offense events took place to show Uranga's lack of possession; (3) That Uranga's allegations of existence of such tapes or of prosecutor's possession. are conclusory only; and, finally, (4) that the CCA denial was not unreasonable.

As to Uranga's *Actual Innocence* claim, the state asserts that it is merely a disguised insufficiency of evidence claim that is precluded by the CCA's decision that is entitled to due deference. Besides, says the state, this claim is procedurally defaulted, unexhausted and barred since it was not raised on direct appeal and cannot now be raised in a habeas corpus proceeding.

<u>Implied Bias Issue Discussion</u>

After Uranga was convicted by the jury for possession of methamphetamine, and during the course of the State's evidence presentation during the punishment phase, a videotape of the car chase was shown to the jury. One of the jurors, Mr. Richardson, recognized as his own the yard Uranga drove through. For the first time, juror Richardson learned that Uranga was the previously unknown person who had driven through his yard in the middle of the night. Thus, juror Richardson was a victim of one of Uranga's unadjudicated extraneous offenses. Richardson reported the situation to the court after lunch and the trial judge conducted a hearing outside of the jury's presence to inquire

into the issue. The colloque between the trial judge and juror Richardson went as follows:

COURT: Okay. Come right over here next to the court reporter, if you would please, sir. You're Kenneth Richardson and you're number 12 on the jury panel, correct?

JUROR: Yes, sir.

COURT: I have told the lawyers what you told me this morning, but on the record I want to be sure my understanding is correct. Yesterday when you watched the video, during the punishment phase, of the car and it went up into somebody's yard and then came back out, my understanding is that you discovered that was your yard?

JUROR: Right, yes.

COURT: And, of course, you had no way of knowing, I don't suppose that that was going to be a part of this case or that it involved this Defendant?

JUROR: No, I didn't.

COURT: So the first time you learned anything about it was when you saw his car pulling up in that yard and pulling back out on that video, right?

JUROR: Right.

COURT: Let me ask you: Have you told anybody else about it?

JUROR: No. Just you.

COURT: Is there anything about that would affect your decision in this case or that would cause you to lean one way or the other?

JUROR: No, sir.

COURT: Was there anything torn up in your yard that might have made you mad that somebody did– somebody did something to your yard?

6

JUROR: The ground was moved up a little bit, but I can replace that. I'm not pressing no charges or anything like that.

COURT: Did you see the car come in there, or just saw it --

JUROR: No. I just saw it on the tape.

COURT: But as far as your yard, did you know anything had happened when it happened, or did you just see it out there later?

JUROR: In the morning, when I was going to work, I saw it.

COURT: So as far as seeing anything that happened about what car came in there or a policeman chasing somebody, you didn't see anything like that?

JUROR: No. No, sir.

COURT: You had no knowledge about anything happening until the next morning when you go out and see car tracks in your yard?

JUROR: Right.

COURT: And you're telling me that the fact that car involves this Defendant, allegedly, and was the one that was on that video in your yard, that would not influence you one way or the other?

JUROR: No, sir.

COURT: You will not hold that against the Defendant in any way?

JUROR: No. No.

COURT: All right. One thing I'm going to say to you is: Do not let it influence you in any way.

JUROR: No, I won't.

COURT: Number two: Do not share that experience with any of the other jury members until

after we get through.[3]

Following this colloque, the trial judge afforded defense counsel an opportunity to further examine the juror.  That opportunity was declined.  Thereafter, the trial judge denied defense counsel's oral motion for mistrial.[4]

### State Court Findings and Conclusions

In addressing Uranga's *implied bias* claim on his direct appeal, the Sixth Court of Appeals discussed the then current status of the "implied bias" doctrine under both Texas constitutional, statutory and case law and federal case law. That court concluded that "Given that neither the Texas Court of Criminal Appeals nor the United States Supreme Court has adopted the implied bias doctrine when it is discovered in the middle of a punishment trial that a juror is a victim of the defendant's extraneous (misdemeanor-level) conduct, we shall not follow Uranga's suggestion that such a doctrine must be applied in this case."  Proceeding from this legal conclusion, the court further determined that the record did not support a finding of "actual bias" by the juror since the trial judge's implied conclusion (which was entitled to deference, absent any evidence to the contrary in the record) that the juror could remain unbiased was supported in the record. The CA observed that the trial judge was "in the best position to weigh the believability of the juror's repeated promises...that in deciding Uranga's punishment, he would not take into account his status as a victim of Uranga's extraneous criminal mischief."[5]  The CA further found that legally and factually sufficient evidence supported the jury's verdict.[6]

---

[3]     RR, Reporter's Transcript of Proceedings, Volume 7, "Discussion with juror," pp. 5-7.

[4]     *Id*. pp.8-9.

[5]     *Uranga v. State*, 247 S.W.3d at 379.

[6]     *Id.* at 381.

Addressing this same issue on discretionary review[7] almost three jurisprudential years later, the Court of Criminal Appeals again discussed the then current status of the United States Supreme Court's acceptance of the "implied bias" doctrine raised by Judge O'Connor's concurring opinion in *Smith v. Phillips*, 455 U.S. 209 (1982) at 221 and articulated its own declination to adopt the doctrine for the State of Texas.  Then, applying its own interpretation of the Supreme Court's decision in *Smith v. Phillips*, the CCA concluded that the trial court's holding of a hearing on the issue of the juror's actual bias was "appropriate and adequate" precluding application of "implied bias doctrine" to mandate a mistrial.  This decision by a majority of the CCA judges drew a scathing dissent from Justices Price and Holcomb saying, "Without fanfare, the Court today announces that there is no such thing as the *Sixth Amendment* doctrine of implied bias. The whole thing is apparently a figment of Justice O'Connor's imagination. I am here to attest that the implied bias doctrine does exist. I know it does; I have seen it."... "Notwithstanding the durability of the Sixth Amendment doctrine of implied bias, the Court today rejects it almost effortlessly, citing only the majority opinion in *Smith v. Phillips* for support."..."  This Court's reliance on that majority opinion today to disown the *Sixth Amendment* doctrine of implied bias is, in my view, a grievous mistake."...."The Sixth Amendment implied bias doctrine is alive and well and ought to be applied on the facts of this case."[8]

This conflict between the majority decision and the dissent frames the need for the following analysis and discussion of this issue in the context of the restrictions upon this Court's authority to review state court decisions.

---

[7]     *Uranga v. State*, 330 S.W.3d 301 (2010).

[8]     *Id*. at 308.

Standard for Review

The AEDPA provides in relevant part that: (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  Interpreting Congress' express language in this section of AEDPA, many courts have adopted explanations of what these two standards mean in the factual contexts of the cases under consideration by those courts.

Under the "contrary to" clause, a federal court may grant the writ of habeas corpus if the state court either arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). Under the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court either unreasonably applies the correct legal rule to the facts of a particular case or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 407; see also, *Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001). A state court unreasonably applies clearly established federal law if it identifies the correct governing principal but unreasonably applies that principal to the facts of the case. *Brown v. Payton*, 544 U.S. 133, 141 (2005). The question is not whether a federal court believes the state court's determination was incorrect but whether that determination

10

was unreasonable- a substantially higher threshold. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The standard for determining whether a state court's application was unreasonable is an objective one, and applies to all federal habeas corpus petitions which, like the instant case, were filed after April 24, 1996, provided that they were adjudicated on the merits in state court. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997).

Furthermore, in reviewing the determinations by the state courts, the Supreme Court further instructed the federal courts to be sure the determinations were made "on the merits" giving "due deference" to the state court's findings.  In the context of habeas corpus, "adjudicated on the merits" is a term of art referring to a state court's disposition of a case on substantive rather than procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).  Upon a finding of state court compliance with the "contrary to" clause of 28 U.S.C. § 2254(d)(1), federal courts give deference to the state court's findings unless such findings violate the "unreasonable application" clause of 28 U.S.C. § 2254(d)(2). *Chambers*, *supra*. at 363. The "unreasonable application" clause concerns only questions of fact.  *Hill v. Johnson*, 210 F.3d 48185 (5th Cir. 2000). The resolution of factual issues by the state court is afforded a presumption of correctness and will not be disturbed unless the habeas petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Sumner v. Mata*, 449 U.S. 539, 550 (1981). Absent such evidence, the presumption of correctness is applied provided that the state court's findings are evidenced in writing, issued after a hearing on the merits, and are fairly supported by the record. 28 U.S.C. § 2254(d) ; *e.g.*, *Burden v. Zant*, 498 U.S. 433, 436-37 (1991); *Williams v. Scott*, 35 F.3d 159, 161 (5th Cir. 1994). Furthermore, as discussed above, AEDPA put into place a deferential scheme, under which the federal court must defer to a state court adjudication on the merits. 28 U.S.C. § 2254(d). In the prefatory paragraph to (d)(1) and (d)(2), the statute provides that an application for a writ of habeas corpus "shall not be

granted with respect to any claim that was adjudicated on the merits in State court proceedings." The word "shall" is mandatory in meaning. *In re Armstrong*, 206 F.3d 465, 470 (5th Cir. 2000); *City of Dallas, Tex. v. FCC*, 165 F.3d 341, 358 (5th Cir. 1999). Thus, the court lacks discretion as to the operation of this section. *Lopez v. Davis*, 531 U.S. 230, 240-41, 121 S. Ct. 714, 722, 148 L. Ed. 2d 635 (2001); *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 772-77, 104 S. Ct. 2105, 2110-2113, 80 L. Ed. 2d 753 (1984). The use of "any" makes clear that this section applies to all cases adjudicated on their merits in state court. The term "adjudication on the merits," like its predecessor "resolution on the merits," refers solely to whether the state court reached a conclusion as to the substantive matter of a claim, as opposed to disposing of the matter for procedural reasons. *Neal v. Puckett*, 239 F.3d 683, 686-87 (5th Cir. 2001); *Mercadel v. Cain*, 179 F.3d 271, 274 (5th Cir. 1999). It does not speak to the quality of the process. *See Green v. Johnson*, *supra* at 1121 (rejecting pre-AEDPA contention that "the resolution on the merits prerequisite is a proxy for the quality of the legal process resolving a dispute"); *Murphy v. Johnson*, 205 F.3d 809, 813 (5th Cir. 2000) (applying *Green* to "adjudication on the merits")

## Discussion

## Status of Implied Bias Standard

As noted above, the CCA decision was rendered on July 8, 2011.  By that time, the CCA had itself already noted that the implied bias doctrine had been accepted by at least five of the circuits, including the Fifth Circuit, without qualification. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. CIM. App. 2008).[9]  As heatedly pointed out in their vehement dissent, Judges Price and Holcomb opined that the majority had wrongly interpreted the then status of acceptance of the implied bias doctrine by the Supreme Court of the United States and by the Circuits.

---

[9]     "The Second, Fifth, Seventh, Ninth, and Tenth Circuits..." at note 33

As to the acceptance of the doctrine, the Dissent was correct.  The doctrine had been firmly accepted by the Supreme Court as well as by the majority of the Circuits.  To the extent that the majority opined otherwise, it was wrong.  Indeed in *Brooks v. Dretke*, 444 F. 3d 328 (2006), summarized by Judge Price in his dissent the Fifth Circuit, after discussing the very cases Supreme Court analyzed by the CCA in its decision, had already opined that the doctrine of implied bias is 'clearly established Federal law as determined by the Supreme Court."[10](emphasis supplied).

Many Fifth Circuit cases both before and after the CCA decision have confirmed the viability and acceptance of the "implied bias doctrine" as the law of the land in both state and federal criminal jury trial prosecutions. *Freeman v. Thaler*, 491 Fed. Appx. 506 (5th Cir. 2012) (Unpublished)("We will find implicit bias as a matter of law only in extreme situations  when "no reasonable person could not be affected in his actions as a juror and in which the Constitution refuses to accept any assurances to the contrary"); *Wiley v. Grimmer*, 476 Fed. Appx. 292 (5th Cir. 2012) ("Because there is no evidence of express bias here, Wiley must show specific facts demonstrating such a close connection between Townsend and the circumstances at hand that bias is implied as a matter of law. *United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988). Juror bias is imputed only in extraordinary circumstances, *Andrews v. Collins*, 21 F.3d 612, 620 (5th Cir. 1994), and no such circumstances were presented in this case. See *Scott*, 854 F.2d at 699-700; *United States v. Buckhalter*, 986 F.2d 875, 879 (5th Cir. 1993); *Brooks v. Dretke*, 444 F.3d 328, 332 (5th Cir. 2006);" *Hatten v. Quarterman*, 570 F.3d 595 (5th Cir. 2009), cert. denied 559 U.S. 906 (2010) (There is also a narrow class of relationships described by Justice O'Connor's concurrence in Smith v. Phillips, and recognized by this court on several occasions, for which a juror can be presumed biased.)

Similarly, the District Courts in the Fifth Circuit have likewise found the "implied bias

---

[10]     At p. 332.

doctrine" to be firmly entrenched in their districts. *Bernuchauz v. Cain*, 2013 U.S. Dist. LEXIS 117083 (ED la. 2013)(recognizing the "implied bias" doctrine has been adopted in the 5th Circuit, citing *Brooks v. Dretke*,  but found that the facts did not fall implicate the doctrine); *Garcia v. Thaler*, 2009 U.S. Dist. LEXIS 116390 (WD Tex. 2009): "The Fifth Circuit recognizes three categories of disqualifying jury bias...Implied bias arises in a narrow category of cases in which a juror can be presumed biased. (citing *Hatten v. Quarterman*).  See Especially Magistrate Judge Karen L Haynes' Report and Recommendation in *Ingram v. Goodwin*, 2013 U.S. Dist. LEXIS 157215 (ED La 2013), adopted by district court 2013 U.S. Dist. LEXIS 157215 (W.D. La., Sept.17, 2013) in which Magistrate Judge Haynes reviewed the entire field of cases on implied bias in the 5th Circuit as they related to the Supreme Court decisions.  Magistrate Judge Haynes also found that "the Louisiana Supreme Court's conclusion to the contrary constitutes an objectively unreasonable application of the doctrine of implied bias."

To the extent the CCA's decision was a determination that the "implied bias doctrine" was neither viable nor accepted, it was wrong.   Nonetheless, Supreme Court and Fifth Circuit jurisprudence instructs us that ".... it is the state court's "ultimate decision " that is to be tested for unreasonableness, and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); see also *Catalan v . Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (". . . we review only the state court's decision, not its reasoning or written opinion . . . ."). Indeed, state courts are presumed to know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19 (2002) at 24. And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, AEDPA's deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002); *Harrington v. Richter*, 131 S. Ct. 770 (2011) at 786."

Thus, a fair reading of the majority decision by the CCA is that it founded its decision, not upon the lack of viability or acceptance of the doctrine, but upon a departure from or narrowing of the application of the doctrine due to the critical facts distinguishing the case before them from those cases in the state and in the federal courts preceding their decision,  to-wit; that the information tending to raise an inference of bias in the juror was communicated during the sentencing phase, rather than the guilt-innocence phase of the trial and, further,  that the potential for bias was curable and was cured by hearing and determination by the trial court. These critical facts led the CCA to announce its departure or narrowing from the "implied bias doctrine," saying:

 "In this case, the trial court held a hearing during the trial on the issue of actual bias. We hold, in accordance with the Supreme Court's reasoning in Smith v. Phillips, that such a procedure was appropriate and adequate. There was no requirement of a mistrial on a theory that bias must be implied to the juror."  p. 306.

Thus,  the CCA was relying upon the context in which the potentially biasing information was communicated to the juror and upon the opportunity for and the effect of a cure.  For the CCA, given that the defendant had already been found guilty of the offense before the information came to the attention of the juror, the possibility of juror bias as to guilt of the defendant was diminished. And the CCA determined that in the light of the colloque between the judge and the juror, actual bias of the juror by was negated as well.  Therefore, CCA concluded that the court could not "imply" that the juror was biased to the extent that the trial court should have granted a mistrial.

## Application of the Standard

As observed by Justice O'Connor, juror bias may manifest itself in many contexts during the guilt/innocence phase or during the punishment phase of a trial, such as: lying on *voir dire*, being a victim of a similar crime, applying for law enforcement job, taking a bribe. Since the Supreme Court's decision in  *Smith v. Phillips*, state and federal courts have been required to explore and

determine the context, scope and effect of the "implied bias doctrine" articulated by Justice O'Connor in her concurring opinion.  Because of the many contexts in which juror bias may arise, it is just such a required exploration that the Supreme Court itself recognized in *Yarborough v. Alvarado*, 541 U.S. 652 (2004) wherein the Court opined, "We begin by determining the relevant clearly established law.  For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by this Court "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). We look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Locker v. Andrae*, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003)."[11]

The Court further explored the scope of the "unreasonable application" saying: "The meaning of "unreasonable" can depend in part on the specificity of the relevant legal rule. If a rule is specific, the range of reasonable judgment may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over time. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations."

One issue the CCA majority relied upon in avoiding the application of the implied bias doctrine was that the bias-causing or bias-initiating information came to juror Richardson during the punishment phase of the trial.  Because juror bias may arise or manifest itself even in the punishment phase of a trial, the mere fact that it is discovered during the punishment phase does not preclude the application of the implied bias doctrine. Rather, the issue becomes whether that bias potential is curable or must be presumed or imputed to the juror even after a curative hearing.  It was just this

---

[11]       At p. 661.

situation that was addressed by Justice O'Connor in *Smith v. Phillips* where she stated, "Because there may be circumstances in which a postconviction hearing will not be adequate to remedy a charge of juror bias, it is important for the Court to retain the doctrine of implied bias to preserve Sixth Amendment rights."[12] This issue of the opportunity and effect of cure (or rehabilitation) is the same principal and results in the same determination the trial court must make during *voir dire* examination when a juror discloses some connection to or information about the offense, the witnesses, parties, law enforcement, etc. Certainly, as recognized by Justice O'Connor, there are some circumstances in the context of a criminal trial both as to guilt/innocence or punishment phases that the bias-generating circumstance or knowledge is so potentially strong that it precludes curing or rehabilitation. For instance, consider the circumstance that a female rape victim is empaneled on the juror for a rape trial. No matter how unlikely it is that such a juror would "escape" discovery during *voir dire*, it would still be unlikely that a trial judge would allow such a juror to remain on the jury during the punishment phase notwithstanding the juror's assurances of impartiality. It would be as unlikely that a court, in the appeal context, would not have difficulty with a trial court's determination that the potential bias could be cured by hearing and juror assurance. It is just such "exceptional" or "extraordinary" situations that "state-court proceedings resulting in a finding of "no bias" are by definition inadequate to uncover bias that the law conclusively presumes."[13]

## Exceptional or Deference

Addressing those circumstances where juror bias potential is great, the Fifth Circuit has opined, "We will find implicit bias as a matter of law only in extreme situations when "no reasonable person could not be affected in his actions as a juror and in which the Constitution refuses to accept any assurances to the contrary." *Brooks*, 444 F.3d at 331; see also *Solis v. Cockrell*,

---

[12]    O'Connor concurrence in *Smith v. Phillips*, at p. 223.

[13]    *Id*. p. 222.

342 F.3d 392, 396 (5th Cir. 2003). We will "not readily presume that a juror is biased solely on the basis that he or she has been exposed to prejudicial information about the defendant outside the courtroom." *Willie v. Maggio*, 737 F.2d 1372, 1379 (5th Cir. 1984).[14]

On the other hand, the same Fifth Circuit opined, "A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fair-minded jurists could disagree" on the correctness of that decision.  And the more general the rule being considered, "the more leeway courts have in reaching outcomes in case-by-case determinations."

### Findings on Implied Bias Claim

I find that the Texas Court of Criminal Appeals reached a wrong legal conclusion when it misconstrued the status of acceptance and application of the"implied bias doctrine" applicable to state as well as federal prosecutions. Nonetheless, the court's legal conclusion that the potential for bias of a juror could and should be explored by a factual hearing at the trial court level as to the source, cause and effect of a bias-generating condition or event was a correct application of the Supreme Court's holdings in the *Rammer* and *Smith* cases and their progeny. I find  that the Court's implied legal conclusion, that the information discovered by juror Richardson was not so bias-producing as to render juror Richardson "impliedly biased" thereby precluding rehabilitation or cure, was supported by the record. I further find that the trial court's implied fact finding that juror Richardson lacked "actual bias" was supported by the trial court record.  I conclude that the Texas Court of Criminal Appeals reached the right result albeit for the wrong reason.

Accordingly giving due deference to the express and implied findings of the state trial and appellate courts' findings and legal conclusions,  I conclude that Uranga has not shown that the state courts' decisions on the merits of his implied bias claim meet either of the criteria under AEDPA

---

[14]      *Freeman v. Thaler*, supra. p. 507.

warranting relief. They did not (1) result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Accordingly I recommend to the District Court that Petitioner's implied bias claim be denied.

Ineffective Assistance of Counsel Claim

Ineffectiveness of Counsel Review Standard

The Sixth Amendment of the United States Constitution guarantees a criminal defendant "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). When a convicted defendant seeks relief on the ground of ineffective assistance of counsel, he must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. *Strickland*, at 687-91 & 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694. "It is well settled that effective assistance is not equivalent to errorless counsel or counsel judged ineffective by hindsight. Rather, inquiry must be made into the totality of the circumstances surrounding counsel's performance to determine whether reasonably effective representation was provided." *Tiering v. Estelle*, 692 F.2d 3, 7 (5th Cir. 1982). A court reviewing an ineffectiveness claim must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence or that, under the circumstances, the challenged action might be considered sound trial strategy. A court reviewing an ineffectiveness claim need not consider the two inquires under *Strickland* in any particular order since a failure to establish either requirement necessarily defeats the claim. *Strickland*, at 697; *Smith v. Paced*, 907 F.2d 581, 584 (5th Cir. 1990).

"The proper measure of attorney performance remains simply reasonableness under prevailing

professional norms." *Strickland*, at 688. "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689 "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id*. at 690; *Knowles v. Mirzayance*, 556 U. S. 111, 124 (2009). When the court's review is governed by AEDPA—as is the case here—the review of the state court's resolution of the ineffective-assistance-of-counsel claim is "doubly deferential", since the question is "whether the state court's application of the Strickland standard was unreasonable." *Harrington v. Richter*, 131 S. Ct. 770, 785, 178 L. Ed. 2d 624 (2011). Importantly, "[t]his is different from asking whether defense counsel's performance fell below *Strickland's* standard," because the "state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id*. Consequently, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 786. Rather, in order to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.

Uranga asserts his trial attorney was ineffective because he failed to "adequately investigate videotape of the evading arrest prior to voir dire."[15] Additionally, Uranga claims that due to counsel's failure "adequately investigate" the videotape, counsel failed to "pro-pound (sic) appropriate question regarding the extraneous offense during the voir dire" and thus, Uranga "forfeited the right to thereafter impute bias to the juror."[16] Finally, Uranga contends that counsel

---

[15]     Docket No.1 at 7.

[16]     *Id*.

was ineffective because he allowed the jury to separate without Uranga's consent.[17]

Uranga presented these claims in his application for state writ of habeas corpus, which was denied with written order, wherein the court observed, "Applicant contends that the State failed to disclose evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), that his rights under the Sixth and Fourteenth Amendments were violated, *and that trial counsel rendered ineffective assistance.*"(emphasis added). Then the court stated, "Based on our independent review of the record, we conclude that Applicant's claims related to his possession of controlled substance conviction are without merit and are denied."[18] This was clearly an adjudication on the merits. *Singleton v. Johnson*, 178 F. 3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (holding a "denial" signifies an adjudication on the merits while a "dismissal" means the claim was declined on grounds other than its merits). Therefore, Uranga must demonstrate this decision was either an unreasonable application of clearly established federal law or an unreasonable application of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

*Strickland* requires a defendant to establish deficient performance and prejudice. Uranga can establish neither. Uranga has not shown "that counsel's representation fell below an objective standard of reasonableness" *Strickland*, at 687-688. Uranga makes no allegation or showing that a pre-trial viewing of the video tape of the car chase incident would have disclosed to Uranga's trial counsel that any prospective juror on the panel, much less that juror Richardson, was the owner of the lawn where Uranga's car traveled during the car chase. According to juror Richardson's own testimony during his colloque with the court, Richardson confirmed that he was not there when the car careened through his yard but discovered the tracks the next morning.[19] Without some sort of notice

---

[17]     *Id.* at 5.

[18]     SHCR-0 1 (EventID: 2447551) at cover, 6, 11-14, 2626-29.

[19]     RR, Reporter's Transcript of Proceedings, "discussion with juror," pp. 5-7.

(visual or otherwise) of a connection between the lawn shown in the video and a juror, Uranga's trial

counsel would have no reason to *voir dire* any member of the panel as to a potential connection of

the juror's lawn with Uranga or to challenge Richardson on his ownership of the impacted lawn.

Therefore, there was no occasion or causation for Uranga's trial counsel to make a strategic or other

reasoned choice to investigate or view the video tape. Adequate effectiveness of counsel, not

perfection, is the standard. Uranga's trial counsel did not fail by either measure.  Every effort must

be made to eliminate the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689.  The state

court's express finding, that Uranga's claims of ineffectiveness of his trial counsel were without

merit, is entitled to due deference and was indeed correct. Accordingly,  I recommend that the

District Court deny Uranga's claims regarding his trial counsel's performance.

### *Brady* Violation Claim

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that the suppression

by the prosecution of evidence favorable to an accused after a request violates due process where

the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of

the prosecution. Impeachment material is evidence "favorable to the accused," and as such comes

under the Brady rule. *Giglio v. United States*, 405 U.S. 150, 154 (1972). To establish a Brady

violation, Uranga must prove the following: (1) the prosecutor suppressed or withheld evidence; (2)

which was favorable; and (3) material to the defense. *Moore v. Illinois*, 408 U.S. 786, 794-95

(1972); *Ogle v. Estelle*, 641 F.2d 1122, 1124 (5th Cir. 1981).

Uranga alleges that the State violated *Brady*  because "the State failed to bring any and all

pictures, films videotapes of this incident."[20]  But he wholly fails to identify any particular item or

category of items he claims were withheld.  Presumably, Uranga is referring to security tapes from

---

[20]        Docket No.1, p. 17 "Error Three."

the Sears store where the theft took place. During the trial there was a discussion of the potential

location of security videos from security cameras at the Sears building where the incident occurred,

but the transcript of that examination does not demonstrate the video's ever existed or were ever in

possession of the prosecution.[21]  Uranga fails to demonstrate that any pictures, films, or videotapes

of the theft existed.  Uranga has not shown that the determination by the Texas Court of Criminal

Appeals to deny his claim on its merit was legally or factually unreasonable.  Because Uranga has

not met his burden, I recommend that the District Court deny this claim.

### Actual Innocence Claim

To leap over the *Kuhlmann*[22] hurdle Uranga claims his "actual innocence" of the drug

possession charge. In support of his claim of "actual innocence" of the offense of possession of a

controlled substance, Uranga claims (1) that the State "did not allege that the weight contained

adulterants or dilutants and did not offer sufficient proof that the controlled substance sized and

tested weighed at least on gram or more but less than four grams" and (2) the law enforcement

witnesses did not tie Uranga to the "Dillard's bag" that contained the drugs, so there was no

evidence that Uranga had possession of them.  This is merely a "sufficiency of the evidence"

challenge masquerading as a claim of actual innocence.

On Uranga's direct appeal, the Texas Sixth Court of Appeals directly addressed Uranga's

sufficiency of the evidence challenge as to the evidence of his possession of the drugs.  The court

expressly found that  "Because...(2) legally and factually sufficient evidence supports the jury's

---

[21]     RR, Reporter's Transcript of Proceedings, Vol. 4, pp. 40-48.

[22]     *Kuhlmann v. Wilson*, 477 U.S. 436 (1986) wherein the court stated "In the light of
the historic purpose of habeas corpus and the interests implicated by successive
petitions for federal habeas relief from a state conviction, we conclude that the
"ends of justice" require federal courts to entertain such petitions *only where the
prisoner supplements his constitutional claim with a colorable showing of factual
innocence*."(emphasis added).

verdict, we affirm the trial court's judgment."[23]  That finding is entitled to deference.  That finding is not an unreasonable determination of the facts. That finding is correct. Furthermore, the factual sufficiency of the evidence cannot be considered on state habeas corpus review[24] and is procedurally barred from consideration here. Accordingly, I recommend that the District Court deny Uranga's claim of actual innocense.

### No Necessity for Hearing

Petitioner requests an evidentiary hearing[25] for purposes of further developing the record in support of his claims. 28 U.S.C. § 2254(e)(2).  However, the Supreme Court case *Cullen v. Pinholster,* 131 S. Ct. 1388, 2011 U.S. LEXIS 2616, 179 L. Ed. 2d 557 (2011)  made clear that federal habeas review under the deferential 28 U.S.C. § 2254(d)(1) standard applicable to claims adjudicated on the merits in state-court proceedings is limited to the record before the state court. Uranga is not entitled to an evidentiary hearing.

### Recommendation

Based upon the foregoing, I recommend that the District Court deny all relief on Uranga's petition.

### Standard Instruction to Litigants

A copy of this report containing findings and recommendations shall be served on all parties in the manner provided by law.  Any party who objects to any part of this order, report, findings and recommendations must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the

---

[23]  *Uranga v. State*, supra. at p. 16-17.

[24]  *Ex parte Grimsby*, 137 S. W. 2d 673, 674 (Tex. CIM. Ap. 2004); *West v. Johnson*, 92 F.3d 1385, 1398, n. 18 (5th Cir. 1996).

[25]  Application, Docket No. 1, p. 20.

24

aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

It is so ORDERED, this 18th day of February, 2014.

*Robert K. Roach*
_____
Robert K. Roach
UNITED STATES MAGISTRATE JUDGE